UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SAM NELIS,

        Plaintiff,

  v.                                                 Case No. 06-C-1220

PHIL KINGSTON,
MARC CLEMENTS, and
LORI SIMON,

        Defendants.

**DECISION AND ORDER**

Plaintiff Sam Nelis, who is presently serving a sentence at Waupun Correctional Institution (WCI), brought this *pro se* civil rights action under 42 U.S.C. § 1983 claiming that the defendant prison officials violated his constitutional right to freely exercise his Native American religion by refusing to allow him to attend weekly Native American pipe and drum ceremonies after he voluntarily quit his prison work assignment. Nelis also complains that there are not enough sacred sweat lodge ceremonies at WCI to meet his spiritual needs. The named defendants include Phil Kingston, WCI warden; Lori Simon, WCI Corrections Program Supervisor; and Marc Clements, WCI Security Director.[1] Nelis seeks thousands of dollars in compensatory and punitive damages from each of them.

The case is presently before me on the defendants' motion for summary judgment. The defendants argue they are entitled to summary judgment because Nelis' free exercise claim fails as

---

[1] Kingston and Clements have since moved on and are no longer working at WCI.

a matter of law, they had no personal involvement with the alleged denial of his right to exercise his religion, and they are entitled to qualified immunity. For the reasons that follow, I conclude that defendants are entitled to summary judgement on two of the grounds asserted. Their motion will therefore be granted and the case dismissed.

## BACKGROUND[2]

WCI, like all Wisconsin prisons, is operated by the Wisconsin Department of Corrections (DOC). The DOC promulgates policies, procedures, rules and directives that govern its institutions. During the time in question, Warden Kingston was generally responsible for the overall operation and supervision of WCI. It was his job to interpret and implement the DOC's policies and procedures. Defendants Simon and Clements were also required to follow such rules and regulations.

Among the internal management procedures Warden Kingston was charged with implementing at WCI was DOC 309-IMP #6, which governs religious beliefs and practices. (Aff. of Linda G. Alsum-O'Donovan, Ex. 1005.) DOC 309-IMP #6 is based on the recognition "that religious beliefs can provide support to inmates that may aid in their adjustment to the institutional

---

[2] Defendants urge the court to accept all of their proposed findings of fact as true, noting that Nelis has failed to comply with Local Rule 56.2(1) by responding to the defendants' affidavits rather than their proposed findings of fact. However, I am reluctant to strictly enforce a procedural rule where doing so would suggest that the result was driven more by plaintiff's unfamiliarity with the rules than by the merits of the case. "The essence of liberal construction is to give a pro se plaintiff a break when, although he stumbles on a technicality, his pleading is otherwise understandable." *Greer v. Board of Educ. of City of Chicago, Ill.*, 267 F.3d 723, 727 (7th Cir. 2001) (quoting *Hudson v. McHugh*, 148 F.3d 859, 864 (7th Cir. 1998)). Nelis has referred to the contested factual assertions in the defendants' affidavits by paragraph number in his response and included specific citations to evidentiary materials in the record to support his claim that material factual disputes exist. I will consider his response sufficient and his failure to fully respond to the defendants' proposed findings of fact will not be deemed fatal.

life and may lead to the development of community ties and values that can be helpful in the inmates successful reintegration to the community upon release." (*Id.*) Under DOC 309-IMP # 6, the various religions to which inmates subscribe are divided into "umbrella groups," such as "Protestant, Islam, Native American, Catholic, Jewish, Buddhist, Wiccan, etc." (*Id.* at 4.) A Protestant "umbrella group," for example, would be composed of "all Protestant denominations such as Lutheran, Baptist, Methodist, Presbyterian, etc." (*Id.*) IMP # 6 then distinguishes between "congregate services" and "study groups" for each umbrella group. Congregate services are defined as "religious services for an Umbrella Religion Group for the purpose of worship & spiritual expression embracing a wide range of religious beliefs." (*Id.* at 3.) "The Department provides opportunities for inmates to practice their religious faith through Umbrella Religion Group Congregate Services, e.g. Catholic Mass, Sweat Lodge Ceremony, Protestant Worship Services." (*Id.*) Umbrella Religion Study Groups, on the other hand, are "designed to appeal to a wide range of religious beliefs within a given Umbrella Religion Group." (*Id.*) According to the procedure, "[t]he Department provides opportunities for inmates to practice their religious faith through Umbrella Religion Study Groups, e.g. Taleem, Bible study, Pipe & Drum Ceremonies, discussion groups." (*Id.* at 5.)

Upon commencing a sentence, inmates wishing to participate in religious services and study groups must indicate their religious preference on a DOC form. Inmates are not authorized to lead or conduct religious services or study groups. Instead, services and study groups are led by a DOC Chaplain, an approved outside Spiritual Leader, an approved outside Volunteer, or through electronic medium if the Chaplain, an outside Spiritual Leader or a Volunteer is not available. (*Id.* at 2.) Institutions provide for equitable distribution of time, space, and limited resources for

3

congregate services and study groups based on number of adherents, space availability, staff resources and security needs. (*Id.* at 4, 5.)

The DOC also recognizes the importance of work in the rehabilitation of inmates. It therefore required institutions to offer work opportunities to inmates when possible and provided disincentives for inmates to refuse. Under DOC Procedure No. 708.14, an inmate who voluntarily chose not to accept a work assignment is placed in the "Voluntary Unassigned" status. (Alsum-O'Donovan Aff., Ex. 1004.) According to the WCI Rules & Information Handbook, inmates in the Voluntary Unassigned status are not paid an institution wage and are not allowed to "attend Library (except Law Library if a documented legal need exists), Structured Recreation, Fine Arts, Hobby, Music, Chapel Studies, or weekday, daytime cell hall recreation." They are required to remain in their cells "except for visits, meals, and non-leisure-time passes." (*Id.*, Exs. 1003, 1004.)

Nelis was transferred to WCI on February 17, 2005. (DPFOF ¶ 2.) Prior to this transfer, Nelis signed a "Religious Preference" form, indicating his adherence to the Native American religion. (Def. Exh. 1000.) Defendants do not question the sincerity of his beliefs. Prior to September, he regularly attended sweat lodge, and pipe and drum ceremonies when offered. On September 21, 2005, Nelis terminated his work assignment with WCI food services. (Def. Exh. 1002.) Although he claims he quit because his physical safety was threatened by other inmates, he made no mention of his fears in his written termination of assignment. Indeed, the written notice he signed states "I, Sam Nelis, ... am voluntarily resigning from my present Food Service assignment effective immediately." (Alsum-O'Donovan Aff., Ex. 1002.) A space on form reserved for additional comments, such as a reason for the decision was left blank by Nelis. According to the affidavit of John O'Donovan, who served as Food Service Security Liaison, Nelis had a history

4

of instigating arguments with other inmates and then complaining of threats. O'Donovan denies that he was made aware of Nelis' concerns. In any event, it is undisputed that Nelis quit his work assignment and acknowledged his decision would result in his placement in voluntary unassigned program status. (*Id*.) As a result, Nelis, was prohibited from attending Native American Pipe and Drum ceremonies from September 21, 2005 through December 19, 2005. (DPFOF ¶ 77.)

During that time, Sweat Lodge ceremonies, available to Nelis despite his program status, were scheduled for October 21 and November 2. Nelis was properly registered to attend both Sweat Lodge ceremonies, but he claims that the October Sweat Lodge was cancelled. (P. Exh. 3.) Nelis admits that the event was not cancelled by the defendants, but by Mr. George Kaemerer, a volunteer who supervised and conducted Native American activities. (P. Resp. Mot. Sum. J. 3.) He also acknowledges that he attended the Sweat Lodge Ceremony held November 2, 2005. (Id.) On January 25, 2006, he reapplied and was hired to his previous work assignment in food services. (Def. PFOF ¶ 104.)

Inmates at WCI were allowed to individually practice their religious faith, even if voluntarily unassigned, through individual study, personal meditation, religious books and publications and approved religious property. (DPFOF ¶ 26.) Nelis was, at all relevant times, allowed to possess religious property, including a medicine bag and a small amount of tobacco. (DPFOF ¶¶ 82-86.)

Nelis nevertheless claims, based on these facts, that the defendants violated his rights under the First Amendment to the United States Constitution and RLUIPA to exercise his religion. Since it is undisputed that the defendants, to the extent they had any involvement with Nelis at all, were simply enforcing the rule making inmates on voluntary unassigned status ineligible for ancillary religious activities, his claim presents a direct challenge to the validity of that rule.

5

**ANALYSIS**

It by now is well established that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). "Inmates clearly retain protections afforded by the First Amendment, *Pell v. Prcunier*, 417 U.S. 817, 822 (1974), including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). On the other hand, it is also clear that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id.* (*quoting Price v. Johnston*, 384 U.S. 266, 285 (1948)). Recognizing the difficulty of balancing these interests, the Supreme Court has fashioned a test for determining the constitutionality of prison rules and regulations alleged to violate prisoner rights that is deferential to the prison administrators charged with and trained in running the prisons. *O'Lone*, 482 U.S. at 349. That test, simply stated, is as follows: "When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.*, (*quoting Turner v. Safley*, 482 U.S. 78, 89 (1987)).

*Turner* set forth four factors courts should consider in making this determination: "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89 (*quoting Block v. Rutherford*, 468 U.S. 576, 586 (1984)). The second factor to consider is "whether there are alternative means of exercising the right that remain open to prison inmates." 482 U.S. at 90. The third factor is "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id*. And finally, the

presence or absence of ready alternatives that fully accommodate the prisoner's rights at de minimis cost to valid penological interests must be considered. *Id*. at 90-91.

Under this test, the rule making inmates on voluntary unassigned status ineligible for certain activities, including ancillary religious activities, is constitutionally valid. It is reasonably related to essential goals of all correctional institutions–maintenance of discipline and order within the institution, and rehabilitation of prisoners. Requiring inmates to work is beneficial both for the institution and the inmate. Inmates who are working are not only performing productive services that benefit the institution directly, they are occupying time that might otherwise be used for activities that could undermine the safety and security of the institution. Work also contributes to the rehabilitation of the inmates and prepares them for their eventual return to the community. As Warden Kingston explained, "The purpose of the WCI work assignment program was to promote institutional order by providing inmates with an incentive for good behavior and to encourage inmates to develop skills that can be useful in helping them to become reintegrated into the community upon release." (Aff. of Phillip A. Kingston ¶ 20.) It therefore follows that prisons, such as WCI, have a strong, indeed compelling, interest in insuring that inmates who have the opportunity to do so maintain employment within the institution. Denying inmates who refuse to accept a work assignment the right to participate in other programs is reasonably related to that goal. *See Russell v. Wilkerson*, 79 Fed. Appx. 175 (6th Cir. 2003) (holding state prison officials' decision to revoke inmate's kosher meals after he stole and purchased non-kosher food items was rationally related to legitimate penological interest in maintenance of prison discipline in facility, and thus did not violate inmate's First Amendment free exercise rights).

7

With respect to the remaining factors, Nelis clearly had other means of practicing his religion. He was allowed to attend sweat lodge ceremonies, when held, and also had the use of his medicine bag and tobacco, which are apparently used for spiritual purposes.[3] Individual study and private meditation remained available, as well. To allow attendance at study group activities despite an inmate's voluntary termination of his work assignment would undermine the work requirement in particular and, more generally, the ability of the institution to enforce its rules. For those inmates who take their religion seriously, the loss of the privilege of attending study group may be the only effective means of obtaining compliance.

Although it is true that Nelis claims he quit his job because of concern for his safety, he made no mention of such concerns in his written termination notice. In fact, the form itself states that he was "voluntarily resigning" from his work assignment and acknowledged that he would be placed in "voluntary unassigned status" for a minimum of 120 days. Given this express admission on his part, prison officials were justified in placing him in "voluntary unassigned status" and restricting his activities as called for under WCI's Rules and Information Handbook. (Ex. 1003.) On these undisputed facts, I find no violation of Nelis' First Amendment rights.

I also conclude that WCI's rule does not violate RLUIPA. RLUIPA provides greater protection to inmates' free exercise rights than the First Amendment. RLUIPA prohibits substantial burdens on any religious exercise, without inquiry into its centrality, unless the burden furthers "a compelling governmental interest," by use of "the least restrictive means." *Cutter v. Wilkinson*, 544

---

[3]Although Nelis also complains that one of the scheduled sweat lodge ceremonies was cancelled, there is no evidence that any of the defendants were involved in the decision to cancel the ceremony. There is thus no basis upon which they could be held liable.

8

U.S. 709, 712 (2005).[4]  But the Supreme Court has indicated that RLUIPA should not be read "to elevate accommodation of religious observances over an institution's need to maintain order and safety." *Id.* at 722.  The Court observed in *Cutter* that "[l]awmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. . . . They anticipated that courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Id.* at 723, citing Joint Statement S7775 (quoting S.Rep. No. 103-111, at 10, U.S.Code Cong. & Admin. News 1993, pp. 1892, 1899, 1900).

Given the deference owed to prison officials in such matters, I am satisfied that conditioning inmate participation in religious activities, such as pipe and drum ceremonies, upon performance of their work assignments does not violate RLUIPA.  The fact that the congregate service and other means of religious exercise remain available shows that the burden is not substantial.  In this case, for example, Nelis could still attend sweat lodge ceremonies and he retained possession of his medicine bag and a small amount of tobacco for religious use.  It is also significant that an inmate's eligibility to attend such activities rests with the inmate.  Nelis chose to forfeit his right to attend pipe and drum ceremonies by voluntarily terminating his work assignment.  Essentially, he held the

---

[4] Defendants argue that Nelis was only granted leave to proceed with a claim under the First Amendment and the court should disregard his RLUIPA claim. (Def. Reply 2.) However, the court explicitly mentioned RLUIPA in its screening order granting Nelis leave to proceed with his claim that defendants unduly burdened his religious practice. (Docket # 4, 6-7.) Given the liberal notice pleading theory underlying the Federal Rules of Civil Procedure, Nelis need not have cited RLUIPA in his complaint. *See Clark v. Briley*, 2005 WL 2369330 (N.D. Ill.) (interpreting pro se litigant's complaint to include a claim under RLUIPA even though plaintiff only expressly alleged violation of the First Amendment).

ticket to such activities in his own hands, but turned it in because he didn't want to work. "[D]eliberate noncompliance with a valid rule does not convert the consequences that flow automatically from that noncompliance into punishment." *Briley v. Rodriguez*, 430 F.3d 952, 952-53 (7th Cir. 2005). It is true that once he voluntarily terminated his work assignment, Nelis was placed in "voluntary unassigned status" for a minimum of 120 days. But he knew that at the time he quit his assignment. That was the bargain he chose.

Even if Nelis were able to demonstrate that inability to attend pipe and drum ceremony substantially burdened the exercise of his religion, his RLUIPA claim would still fail because the rule is the least restrictive means of insuring compliance with the prison's work requirement. Prison officials are not required to adopt an ad hoc approach in which they remove activities, one by one, until they arrive at the one activity an inmate is not willing to forfeit. They need not bargain with those they are required to hold in custody. The prison handbook spells out the consequences of voluntarily quitting one's work assignment, including loss of eligibility for participation in ancillary religious activities. An inmate who quits his job despite those consequences is saying by his conduct that even the denial of religious activities is not sufficient to keep him in his assignment. If less restrictive measures were sufficient, no one would ever quit.

I therefore conclude that Nelis' First Amendment and RLUIPA claims fail on their merits. But they also fail for another reason. Even if I am in error as to the validity of WCI's rule prohibiting inmates on voluntary unassigned status from attending ancillary religious activities, the defendants would nevertheless be entitled to summary judgment because, under the circumstances of this case, they are immune from liability for damages. Public employees, such as the defendants are entitled to qualified immunity unless their conduct violated "clearly established statutory or

10

constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). I have already concluded that Nelis' claims under the First Amendment and RLUIPA fail on their merits. Unless my conclusion is wholly irrational, it necessarily follows that the conduct of the defendants does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known. I do not believe my conclusion is irrational and thus conclude that, even if I am wrong on the merits, the defendants are nevertheless immune from liability.

Finally, I note that for the three-month period he was on voluntary unassigned status and unable to attend pipe and drum ceremonies, Nelis seeks from the defendants compensatory and punitive damages in the total amount of $230,000. No other relief is sought. Yet, under the Prison Litigation Reform Act (PLRA), recovery in prisoner lawsuits is limited where, as here, there is no showing of physical injury. In the words of the PLRA, "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). While the Seventh Circuit has held in an unpublished decision that this language does not bar prisoner lawsuits where nominal or punitive damages may be available, *Robinson v. United States,* 80 Fed. Appx. 494, 498 (7th Cir. 2003), I conclude from the record before me that punitive damages are not appropriate in this case as a matter of law. *See Smith v. Wade*, 461 U.S. 30, 56 (1983) ("We hold that a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."). Thus, what is left is nominal

11

damages, which amount to one dollar. *Kyle v. Patterson*, 196 F.3d 695, 697 (7th Cir. 1999). That is what Nelis would be entitled to recover were he to establish a violation of his rights. As it turns out, he has failed to show a right to recover, even when the facts are viewed in his favor. I therefore conclude that the defendants' motion for summary judgment should be granted.

**IT IS THEREFORE ORDERED** that defendants' motion for summary judgment is **GRANTED** and this action is **DISMISSED** with prejudice. The clerk is directed to enter judgment accordingly.

Dated this   19th   day of November, 2007.

s/ William C. Griesbach<br>
William C. Griesbach<br>
United States District Judge